IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:22-CR-22-RAH-KFP |
| | ) | |
| DOUGLAS MATTHEW BERRY | ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the Court on Defendant Douglas Matthew Berry's Motion to Suppress (Doc. 22) and the Government's response (Doc. 26). The Court held an evidentiary hearing on May 3, 2022. Defendant then moved the Court to reopen the hearing (Doc. 37). After granting the motion, the hearing was continued on June 28, 2022.[1] For the reasons discussed below, the Court recommends the motion be DENIED.

### **I. FACTS**

#### **A. Defendant's Supervised Release**

Defendant was on supervised release at the time of the search at issue here, and he has a sorted history with compliance while on release. On March 30, 2015, Defendant pleaded guilty to one count of conspiracy to distribute and to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841 and 846. He was sentenced to 36 months' imprisonment in July 2015, and after the term of imprisonment, Defendant had a five-year term of supervised release. Case No. 2:14cr647, Doc. 173.

---

[1] The transcript from the first hearing on May 3, 2022 (Doc. 29), is referred to here as Tr. Vol. I and the transcript from the second hearing conducted on June 28, 2022 (Doc. 43), is referred to here as Tr. Vol. II.

On November 16, 2018, Defendant's probation officer, Brad Brockett, filed a petition to revoke his supervised release based on, among others, alleged violations related to use and possession of methamphetamine. Case No. 2:14cr647, Doc. 210. On February 11, 2020, Defendant's supervised release was revoked. Doc. 241. He was sentenced to time served, and began, again, his supervised release term. *Id.*

Defendant was first supervised out of the Dothan office by Officer Brockett. The other probation officer in that location, Chris Robertson, regularly accompanied Officer Brockett when he visited Defendant. Tr. Vol. I, 6:14–7:17. Per the terms of Defendant's supervised release, his probation officer would periodically conduct home visits and drug tests. *See* Case No. 2:14cr647, Doc. 241.

Defendant's probation officer had to repeatedly report his noncompliance with the terms of his supervised release (failed drug tests) to the Court and, again, petitioned to revoke his supervision in November 2020. Tr. Vol. I, 12:9–23; *see* Case No. 2:14cr647, Doc. 248. The petition to revoke was based, in part, on allegations that Defendant had been in possession of a stolen vehicle, had drugs, and had associated with a known convicted felon. Case No. 2:14cr647, Doc. 248. Probation received reports from local law enforcement that Defendant had been in possession of a stolen vehicle; Defendant claimed he had acquired the vehicle from an individual who was known to Probation as a convicted felon. Tr. Vol. I, 11:4–12. At their request, Defendant met with probation officers and allowed them to search the vehicle. Tr. Vol. I, 11:2–14. The search revealed a small amount of a crystalized substance in the driver side door, which was field tested and positive for methamphetamine. Probation Officers also found $1,200 cash in the vehicle during the

search. Tr. Vol. I, 11:15–20. At that time, Defendant was an hourly employee of his father's golf cart business earning only about $10/hour. Tr. Vol. I, 11:24–12:4. Defendant was an admitted methamphetamine addict. *See* Tr. Vol. I, 9:12–17; 33:21–24. The revocation proceedings were continued to allow Defendant to participate in substance abuse and mental health treatment. Tr. Vol. I 12:24–13:9; *see* Case No. 2:14cr647, Doc. 259. He completed inpatient treatment in late December 2020. Tr. Vol. I, 31:8–12.

Defendant was considered a high-risk supervisee due to his numerous violations of conditions. Tr. Vol. I, 14:21–25. Importantly, the special conditions of Defendant's supervised release, which were reviewed with him by his probation officers, included that he submit to a search of his person, residence, office, and vehicle. Case No. 2:14cr647, Doc. 241 (Special Condition 3).

### B. Report of Drugs in Defendant's Home

After Officer Brockett retired, Officer Robertson took over Defendant's supervision and Officer Seth Spooner joined that office. Tr. Vol. I, 6:14–7:4. On January 5, 2021, Officer Robertson was visiting with another supervisee, Mickey Donaldson, who had failed a drug test for methamphetamine. Tr. Vol. I, 9:10–19. When Officer Robertson questioned Donaldson about his drug use, Donaldson reported that he had used methamphetamine with Defendant at Defendant's residence, that Defendant was selling methamphetamine out of his residence, and while he was at Defendant's residence, Donaldson observed a "large amount" of drugs there. Tr. Vol. I, 9:22–20:2; Tr. Vol. II, 7:2–8:4, 9:1–4, 16:12–20. Donaldson was himself a convicted felon and a known drug user. While Officer Robertson passed this information along to local law enforcement, he did not find it reliable enough

to act upon, i.e. to go and search Defendant's home for this purported "large among of drugs." Tr. Vol. II, 16:12–20, 18:24–19:25, 20:3–18.

### C. The Home Visit

On January 21, 2021, Officer Robertson and Spooner went to Defendant's residence, where he lived in a double-wide mobile home, for a routine home visit and drug test. Tr. Vol I, 13:19–14:8; 16–20; 32:4–10; Tr. Vol I, 20:3–8. When they arrived, Officer Robertson noticed five unknown vehicles present, which he found unusual—Officer Robertson knew him to live alone and have only one vehicle. Tr. Vol. I, 13:25–14:10; 15:17–24. As he and Officer Spooner approached the residence, they could hear people inside running through the mobile home. Tr. Vol. I, 16:6–12. They knocked on the door and announced themselves, but no one would come to the door. Tr. Vol. I, 16:13–21. While they were attempting to clear the residence, Officer Robertson called Defendant, who reported he was at work at his father's golf cart shop. Tr. Vol. I, 16:22–17:11. Officer Robertson doubted that this was true because Defendant had recently tested positive (again) for methamphetamine, and he believed Defendant would hide to avoid another positive drug test. Tr. Vol. I, 16:2–5.

Eventually, a male, later identified as Alexander Barnett, exited the rear main entrance of the mobile home. Tr. Vol. I, 17:12–21. Officer Spooner, who was at that rear exit, frisked him and found a user-amount of methamphetamine and a syringe. Tr. Vol. I, 24:18–25:1. Barnett was detained. Officer Robertson still thought Defendant was likely hiding inside the mobile home, and he could still hear people inside who were not exiting the residence. Tr. Vol. I, 17:24–18:5. Officer Robertson stepped up on the porch and,

through the mobile home's open rear door, saw another male inside. Tr. Vol. I, 18:15–20. That person was later identified as Curtis Atkinson. Tr. Vol. I, 25:17–18. Officer Robertson ordered Atkinson out, and as he complied, Officer Robertson saw an empty gun holster on his hip. Tr. Vol. I, 18:21–19:3. Officer Robertson patted him down for safety thinking he may have a gun; he did not, so Officer Robertson handcuffed the man. Tr. Vol. I, 25:17–25. Then, two more people, females, exited the mobile home, but others could still be heard inside. Tr. Vol. I, 19:10–19. The females were patted down, but the officers did not find any contraband. Tr. Vol. I, 26:5–9. Despite the officers' commands to exit, other individuals remained inside the mobile home. Tr. Vol. I, 19:17–22.

Those who exited the home told officers "they didn't know" if Defendant was inside. Tr. Vol. I, 19:23–20:2. As the number of people outside the home grew and others could still be heard inside, for officer safety, the probation officers contacted local law enforcement for assistance at the scene and, per their internal procedures, they also contacted their supervisor, Ellen Traywick, for permission to search the residence. Tr. Vol. I, 20:3–21:4. They advised Traywick: there were a number of then-unknown people at Defendant's residence; they had found drugs on one individual; others were heard inside but refused to exit the residence; and Defendant claimed to be at work, but Officer Robertson believed he could be inside. Tr. Vol. I, 26:15–23. Officer Robertson believed that Defendant was hiding inside to avoid taking a drug test or because there were drugs inside. Tr. Vol. I, 19:7–9, 26:23–27:1; Tr. Vol. II, 13:25–14:13. Because of the empty gun holster, Officer Robertson also thought it possible a firearm could be inside. Tr. Vol. I, 19:1–6. There were also exigent circumstances, according to Officer Robertson, because

he believed Defendant was hiding inside possibly with drugs that could be discarded or lost. Tr. Vol. I, 29:15–19. Officer Robertson believed all of this provided a basis to search, because, under Defendant's Special Conditions of release, search of his residence was permitted with reasonable suspicion. *See* Tr. Vol. I, 21:6–14. Additionally, the policy permits a search under exigent circumstances, which according to Officer Robertson, includes where a person is in danger or there could be a loss of evidence. Tr. Vol. I, 23:13–18.

   D. The Search

Chief Probation Officer Al Lancaster called Officer Robertson back and gave the okay to search the residence. Tr. Vol. I, 27:2–9. When additional law enforcement from Houston County arrived, deputies from the Alabama Law Enforcement Agency ("ALEA") Drug Task Force, they assisted Officers Spooner and Robertson first in clearing the home. Tr. Vol. I, 28:20–29:16. They located two more adult females and two minors. Tr. Vol. I, 29:14–25. Once the house was cleared, law enforcement next searched the home. Tr. Vol. I, 33:11–18.

At some point during the process, Defendant arrived home and Officer Robertson talked with him. Tr. Vol. I, 33:6–15. Defendant had, in fact, been at work and his mother drove him home. Tr. Vol. I, 24:6–14; 46:2–13. Officer Robertson drug tested him; Defendant was positive for methamphetamine. Tr. Vol. I, 33:16-20. Defendant admitted he was high. Tr. Vol. I, 33:21–24.

During the search, law enforcement found the evidence Defendant seeks to suppress: two rifles and a shotgun located behind the living room couch; a shotgun found

above a kitchen cabinet; a handgun and more than 50 grams of suspected methamphetamine discovered in a black safe; and other suspected drugs (including heroin and marijuana) and drug paraphernalia (including digital scales) inside the mobile home. *See* Tr. Vol. I, 36:14–38:17; Def.'s Ex. 2.

While law enforcement remained at Defendant's residence, Defendant was interviewed by Houston County Sheriff's Office/ALEA Task Force Officer Anthony Hall inside Hall's truck. Tr. Vol. I, 41:22–25; 42:12–15. Initially, he denied knowledge of the guns found in his home. Tr. Vol. I, 42:6–7. Defendant was mirandized and admitted to selling methamphetamine to support his drug habit. Tr. Vol. I, 42:1–5. While they remained at the residence, Officer Robertson told Defendant something to the effect of: "It's to your benefit to cooperate." Tr. Vol. I, 43:23–44:1. Initially, Defendant denied knowing about the safe. Tr. Vol. I, 44:9. But, about an hour or so after the initial interview, Defendant, who was agitated, blurted out something like, "F*** it, I want to own my sh**. I knew about all of the drugs and guns in my house."; he also admitted he possessed the firearm found in the safe for personal protection. Tr. Vol. I, 44:10–45:22; *see also* Def's Ex. 1, January 28, 2021 Report at p. 2; Doc. 22, para 7. Later, Defendant was arrested and taken to the Geneva County Jail. Tr. Vol. I, 43:11-19.

## II. DISCUSSION

### A. Introduction

The parties agree that the issue is whether the reasonable suspicion standard was met.[2] In his motion to suppress, Defendant contends that Officer Robertson lacked the reasonable suspicion required to conduct the search that resulted in discovery of the guns, methamphetamine, and other suspected drugs and drug paraphernalia. He further argues even if Officer Robertson had reasonable suspicion to initially enter the residence to search for Defendant, Robertson did not have reasonable suspicion to conduct the search that followed clearing the house of its occupants. Defendant asks the Court to suppress the contraband that was located in the search of the residence. In its response, the Government argues that Officer Robertson had reasonable suspicion to perform the search—start to finish. The Government argues that Officer Robertson had reasonable suspicion to cross the home's threshold and begin the search to include removal of the occupants hiding inside and search for contraband. The Government rejects Defendant's attempt to divide the reasonable suspicion between crossing the home's threshold for the purpose of clearing the house and searching it.

---

[2] Some courts have found that a warrantless search of a probationer's home need not be supported by reasonable suspicion. *See United States v. Williams*, 650 F.App'x 977, 980 (11th Cir. 2016) (citing *United States v. King*, 736 F.3d 805, 806, 810 (9th Cir. 2013) (suspicionless search pursuant to suspicionless condition did not require reasonable suspicion); *United States v. Tessier*, 814 F.3d 432, 435 (6th Cir. 2016) (a suspicionless search of a probationer's residence was reasonable given the terms of the probation agreement providing for such a search)). The Court need not decide that issue given the parties' agreement that reasonable suspicion is the applicable standard, and the Court finds it is met as discussed in the text.

## B. Reasonable Suspicion Standard

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. Amend. IV. "The Fourth Amendment's protection against unreasonable searches and seizures unquestionably applies to probationers." *United States v. Wasser*, 586 F. App'x. 501, 504 (11th Cir. 2014) (citing *Owens v. Kelley*, 681 F.2d 1362, 1367 (11th Cir. 1982)). There is an important distinction, however, for probationers compared to others free in society. "Probationers . . . have a diminished expectation of privacy and 'are subject to limitations to which ordinary citizens are free.'" *Id*. (quoting *Owens*, 681 F.2d at 1367–68).

The Eleventh Circuit has succinctly discussed the reasonable suspicion standard applicable in assessing whether a warrantless search of a probationer's home violates the Fourth Amendment.

> In *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Supreme Court held that the warrantless search of a probationer's home by a law enforcement officer for investigatory purposes was permissible, even though it was supported by only a reasonable suspicion, rather than probable cause, that criminal conduct was occurring. 534 U.S. at 121–22, 122 S.Ct. 587. The probationer was subject to a condition requiring him to submit to searches of his residence by any probation officer or law enforcement officer at any time, with or without a search warrant, warrant of arrest, or reasonable cause. 534 U.S. at 114, 122 S.Ct. 587. A sheriff's detective decided to search the probationer's apartment after observing suspicious objects in the probationer's trunk, and, aware of the probationer's search condition, did not apply for a warrant. *Id*. at 115, 122 S.Ct. 587.
>
> The Court stated that "the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id*. at 118–19, 122 S.Ct.

> 587 (quotation omitted). Balancing these competing considerations, the Supreme Court noted that a probationer does not enjoy the same amount of liberty as other citizens. *Id*. at 119, 122 S.Ct. 587. It further noted that probationers are more likely to commit crimes than other citizens, and the government therefore has an interest in keeping close watch over them. *Id*. at 120, 122 S.Ct. 587. Furthermore, probationers have a greater incentive to conceal the evidence of their crimes, because they are subject to greater scrutiny than the average citizen. *Id*. The Supreme Court determined that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of th[e] probationer's house." *Id*. at 121, 122 S.Ct. 587.

*United States v. Riley*, 706 F. App'x. 956, 959–60 (11th Cir. 2017) (citing *United States v. Yuknavich*, 419 F.3d 1302, 1310–11 (11th Cir. 2005) (following *Knights* and reasoning the probationer's computer use reduced his expectation of privacy in his computer; thus, the search of the computer was permissible based only on reasonable suspicion); *United States v. Carter*, 566 F.3d 970, 973–75 (11th Cir. 2009) (following *Yuknavich* and finding a warrantless search of a probationer's home based on reasonable suspicion was constitutionally permissible, even in the absence of a condition of probation permitting such a search)).

While *Riley* is an unpublished decision, the Court, nevertheless, finds its discussion above of the applicable standard persuasive and informative here. *Riley*, 706 F. App'x. 959–60 (finding probation officers aware of the following had reasonable suspicion to suspect a violation of probation and that there were possible drugs or other prohibited items at probationer Riley's residence: "(1) Riley had a prior cocaine-related conviction, (2) [an] anonymous tip indicated that Riley was selling drugs from the house, (3) Riley's community control prohibited him from possessing any drugs or visiting places where drugs were sold or used, (4) the anonymous tip indicated that Riley was driving a white

Audi, and (5) Riley was placed on community control because he had been driving without a license[.]"). The Eleventh Circuit progeny under the binding precedent in *Knights*, which the Court discusses in *Riley*, concerned probationers, but that reasoning is also applicable to cases involving supervised releasees. Indeed, supervised releasees have an even more diminished expectation of privacy. *See United States v. Coleman*, 796 F. App'x 981, 984 (11th Cir. 2019) (citing *Knights* and finding officers had reasonable suspicion to search supervisee's vehicle based on release condition allowing search of vehicle and canine detecting drugs); *United States v. Makeeff*, 820 F.3d 995 (8th Cir. 2016) ("Supervised release, parole, and probation lie on a continuum. The most severe is supervised release, which is followed, in descending order, by parole, then probation. Thus . . . the current case involves the most circumscribed expectation of privacy.") (internal quotation marks and citations omitted).

Applying the *Knights* analysis here, it is plain that as a supervised releasee Defendant does not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty dependent upon his observing special release conditions. *See Yuknavich*, 419 F.3d at 1308 (citing *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). This is even clearer here because Defendant's Special Conditions, to which he agreed, specifically required that he "submit to a search of his person, residence, office and vehicle pursuant to the search policy of this court." Tr. Vol. I. 8:19–9:2; *see Knights*, 534 U.S. at 118 (consent is salient factor in assessing defendant's reasonable expectation of privacy under the totality of the circumstances test). Thus, the Court concludes that Defendant had a significantly reduced expectation of privacy in his home at the time of the search. In

addition, the same legitimate governmental interests support the search in this case as in *Knights*, *Carter*, *Yuknavich*, *Riley*, and similar cases. Furthermore, Defendant has a history of committing violations of his release conditions, which makes the government's interest in monitoring his supervised release particularly high. *See Carter*, 566 F.3d at 974–975.

Next, to determine whether the required reasonable suspicion existed for the search, the Court "must look to the 'totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.' . . . To determine whether officers had reasonable suspicion, [the court] 'must take stock of everything they knew before searching.'" *United States v. Gomes*, 279 F. App'x. 861, 870 (11th Cir. 2008) (citations omitted). Reasonable suspicion requires a sufficiently high probability that criminal conduct or conduct in violation of supervised release conditions is occurring to make the intrusion on the individual's privacy interest, albeit a diminished interest, reasonable. *See Yuknavich*, 419 F.3d at 1311. "The Eleventh Circuit has stated that '[w]hether an officer has reasonable suspicion is an objective question viewed from the standpoint of a reasonable officer at the scene.' . . . The determination is based upon an examination of the 'totality of the circumstances,' but the subjective motives of the officer are immaterial." *Madaio v. Franklin*, No. 5:12-cv-02696-KOB, 2014 WL 130462, at *4–5 (N.D. Ala. Jan. 14, 2014) (citations omitted). Critically here, an officer's knowledge of the individual's past criminal convictions and violations is a relevant factor in determining whether he had reasonable suspicion to search the probationer's property. *See id*. at *4 and n.10; *see also Yuknavich*, 419 F.3d at 1311.

## C. Analysis

Here, taking "stock of everything [Officer Robertson] knew before searching," it would be reasonable for an officer in his position at the scene to suspect legal wrongdoing—either a supervised release violation or an otherwise criminal act. Specifically, it would have been reasonable taking together the facts and rational inferences for an officer in Robertson's position to have suspected that Defendant was in possession of and attempting to conceal drugs inside his home, had a gun inside his residence, and was hiding inside to avoid being discovered with or having used drugs.

First, Officer Robertson was personally acquainted with and had supervised Defendant or observed him (while under Brockett's supervision) for years before the search occurred. He was aware that Defendant was a convicted felon, an admitted methamphetamine addict, and had repeatedly violated his conditions of release, including a prior revocation, numerous failed drug tests, and possession of drugs while on release.

Second, Officer Robertson was aware that another felon had reportedly bought drugs from Defendant and used them in his home—where "a large amount of drugs" was observed. While Officer Robertson credibly and readily acknowledged this was not the motivating basis for the search (or the home visit), it was information he had and was considering along with everything else he knew at the time. Tr. Vol. I, 9:22-10:2; Tr. Vol. II, 10:23–11:7, 18:24–20:8, 20:19–21:7.

Third, what he knew about Defendant's history was considered in the context of Officer Robertson discovering numerous unknown vehicles at Defendant's residence where he lived alone, believing Defendant was hiding inside the residence, hearing people

run through the home who ignored directives to exit, finding Defendant's drug of choice on one individual who exited, and identifying an empty gun holster on another individual. Although Defendant argued it was not reasonable for Officer Robertson to believe Defendant had possession of a gun based on the empty holster, it was certainly not implausible for Officer Robertson to believe there was a firearm inside Defendant's home, and possession of a firearm would violate the terms of Defendant's supervised release. Tr. Vol. I, 14:7–9 ("Mr. Berry's a convicted felon. He's not allowed to be around -- I mean, he can't possess a firearm."); (Supervised release conditions mandate: "The defendant shall not possess a firearm . . . ."). Additionally, while they saw no drugs in plain view as they cleared the home, officers did see the butt of a gun sticking out from behind the sofa in the living room of the mobile home as they cleared it. Tr. Vol. I, 37:5–38:17; Tr. Vol. II, 13:2–3.

    All of this was known to Officer Robertson as he cleared the residence of those who would not exit and searched it. Together, these facts support more than a mere hunch of criminal activity—they support a particularized reasonable suspicion to search the residence. While Officer Robertson's belief that Defendant was hiding inside evaporated when his mother drove Defendant home, the remaining facts, which supported his reasonable suspicion to search the home did not. *See Wasser*, 586 F. App'x at 505 (finding, after probation officers lawfully entered a probationer's residence, officers developed reasonable suspicion to believe probationer had violated conditions justifying search). Moreover, Officer Robertson acted consistently with policy and with the Special Condition of Defendant's release, which provided that Defendant "shall submit to a search of his

person [and] residence . . . ." *See Carter*, 566 F.3d at 975 ("When a probationer has a condition of probation reducing his expectation of privacy, and the government has a higher interest in monitoring the probationer due to the nature of his criminal history, a search can be permissible when supported only by reasonable suspicion."). "Reasonable suspicion 'is considerably less than proof of wrongdoing by a preponderance of the evidence' and less than probable cause, which is 'a fair probability that contraband or evidence of a crime will be found.'" *United States v. Henderson*, 145 F. App'x. 346, 351 (11th Cir. 2005) (citation and internal quotation marks omitted) (unpublished).

> [I]t is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases—especially those involving drugs or illegal weapons—the probation agency must be able to act based upon a lesser degree of certainty that the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.

*Id*. (citing *Griffin*, , 483 U.S. at 879). This is equally true in the context of a supervised releasee.

In summary, Officer Robertson approached the home visit knowing that Defendant had a problematic supervision history, particularly with methamphetamine use. As the events unfolded upon arrival at Defendant's home, he had reason to believe that Defendant was hiding, that Defendant was using or hiding drugs, and that Defendant had a firearm inside his home. Viewed in the totality of the circumstances, and taking into account all that Officer Robertson knew prior to initiating the search of Defendant's home, it would

have been reasonable for an officer with knowledge of these facts to suspect that Defendant was engaged in or attempting to conceal criminal activity or a violation of his supervision conditions.

Defendant cites no basis to separate the reasonable suspicion to clear the house from that which was the basis to search the house—both were done on the same set of facts and circumstances. Defendant's appearance at the house at some point in the process did not extinguish the basis for the search, it only removed one of the facts in consideration and serving as part of the totality of the circumstances: a belief that Defendant was hiding to avoid discovery with or having used drugs. The Court must consider all facts known to Officer Robertson prior to his initiating the search in determining whether a reasonable officer in his position would have suspected wrongdoing. Based on the foregoing analysis, the Court finds that Officer Robertson's knowledge—taken together in this context—satisfied the standard, even when Robertson's belief that Defendant was hiding in the home is not considered after Defendant arrived home. *See Henderson*, 145 F. App'x. at 351-52 (officers had reasonable suspicion to search supervised releasee's home where probation officer had reports from law enforcement of possible drug activity, attempts to make contact with releasee were unsuccessful, suspicious items were observed during a prior home visit, officer observed unusual traffic around releasee's residence, and releasee had prior failed drug test); *see also Wasser*, 586 F. App'x at 505 (probation officers had reasonable suspicion of criminal activity after lawfully entering residence whereupon they saw swords and knives in plain view and possession of such weapons violated the conditions of probation and they also knew probationer had a prior weapons charge, was

involved in a gang, and they had an anonymous tip that probationer possessed guns and drugs). The absence of the belief that Defendant was hiding inside, which dissolved upon his arrival back at home, does not preclude a finding of reasonable suspicion based on the remaining facts and circumstances in existence at that time.

Thus, the Court concludes that Officer Robertson possessed the necessary reasonable suspicion to search Defendant's residence, which resulted in locating two rifles, two shotguns, a handgun, more than 50 grams of suspected methamphetamine, a black safe, and other suspected drugs and drug paraphernalia. Under the totality of the circumstances, the Court finds no Fourth Amendment violation here.

### III.  CONCLUSION

Defendant has failed to establish that Officer Robertson lacked reasonable suspicion to conduct the search in question. Accordingly, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. 22) be DENIED. It is further

ORDERED that on or before **July 29, 2022**, the parties may file objections to the Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered by the Court. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District

Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1. *See Stein v. Lanning Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 15th day of July, 2022.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE